```
          IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
                    EASTERN DIVISION
```

| | |
|---|---|
| **CREATIVE FINANCIAL STAFFING LLC,**<br><br>                **Plaintiff,**<br><br>    v.<br><br>**ISABEL LOPERA KUBACKI,**<br><br>                **Defendant.** | **Case No. 22 C 488**<br><br>**Judge Harry D. Leinenweber** |

## MEMORANDUM OPINION AND ORDER

Plaintiff Creative Financial Staffing LLC's ("CFS") filed a Motion for a Preliminary Injunction against its former employee, Defendant Isabel Lopera Kubacki ("Kubacki"), on January 28, 2022. (Dkt. No. 9.) In response, Defendant Kubacki filed a Motion to Dismiss, arguing, *inter alia*, the Court lacked jurisdiction to hear the claim. (Dkt. No. 27.) The Court found that it had jurisdiction over the parties and denied the Motion to Dismiss on May 18, 2022. (Dkt. No. 46.) The parties then engaged in expedited discovery, and on July 26, 2022, CFS supplemented its Motion for a Preliminary Injunction. (Dkt. Nos. 61—64.) For the reasons stated herein, the Court denies the Motion.

I. **BACKGROUND**

The Court refers generally to the facts established in its Opinion and Order denying Defendant's motion to dismiss. (Order, Dkt. No. 46.)

**A. Parties and Landscape**

Plaintiff CFS is a national accounting, finance and technology recruiting and staffing firm. (Order at 1.) Defendant Isabel Kubacki is a former CFS employee now employed at a competitor firm specializing in accounting and finance recruiting and staffing. (*Id.* at 2–5.)

The parties agree that the financing and accounting staffing and recruiting market in the Chicago area is competitive. To fulfill their hiring needs, companies often engage the services of many staffing firms in their efforts to fill one role. (*See* Am. Compl. (hereinafter "Compl.") ¶ 66, Dkt. No. 18; Answer ¶ 66, Dkt. No. 50; McCarthy Dep. 55:15–57:6, 58:5–59:4, Dkt. No. 61-2.)

CFS earns revenue on a contingency basis. (Order at 1.) CFS systematically records details of the sale, including the company name, position filled, salary of position filled, fee rate to client, commission rate corresponding to the salary range of the job filled, and the employee(s) entitled to commission for making the sale. (*See* Pl. Supp. Brief for Prelim. Inj. Ex. A:5 Commission Report, Dkt. No. 61-1 at 35–122; Ex. A:6 Placement Commission

Report for Kubacki, Dkt. No. 61-1 at 123—153; Ex. A:11, Dkt. No. 61-1 at 236—239.)

### B. Kubacki's Employment

CFS hired Kubacki in November 2010. (Order at 1.) Around the time of her hire, Kubacki signed three documents related to solicitation and confidential information disclosure. (*Id.* at 2) First, on November 17, 2010, Kubacki signed both a Non-Compete/Non-Disclosure Agreement and an Acknowledgment of Employee Regarding Confidential Information and Trade Secrets between herself and CFS-Crowe Chizek, LLC. (*Id.* at 2—4). A few days later, Kubacki signed an additional Confidentiality Agreement between herself and Crowe Horwath LLP. (*Id.* at 4—5.) The Confidentiality Agreement contained a severability clause. (Order at 14—15.) During Kubacki's employment, her duties included sourcing and working with clients and candidates, placing candidates, and obtaining job orders. (Answer ¶¶ 47—52.)

By virtue of her position, Kubacki gained access to CFS' computerized customer relationship management system, PCRecruiter ("PCR"). (Answer ¶ 22, 52.) Also referred to as "its candidate and client tracking program" (Pl. Supp. Brief for Prelim. Inj., Dkt. No. 61 at 2), PCR contains CFS clients and candidates' "addresses, key contacts, communication logs, and transaction fees and history" (Answer ¶ 22; *see* Kubacki Marketing Report, ex. A:8; Dkt.

No. 61-1 at 167—222), as well as information on job openings, including what the company is looking for in a candidate (McCarthy Second Decl., Dkt. No. 61-1 ¶¶ 7—9). Kubacki, like other CFS recruiters, was expected to record in PCR notes of her engagement with clients and prospects. (Answer ¶ 24; Def. Dep., 37:15—23; *see* Pl. Supp. Brief for Prelim. Inj., Dkt. No. 61 at 3; Kubacki Marketing Report, ex. A:8; Dkt. No. 61-1 at 167—222.) By aggregating such notes from CFS employees since 2001 (Compl. ¶ 23), PCR served as a compilation of data that CFS employees could consult to inform their work.

On October 28, 2021, CFS fired Kubacki, (Compl. ¶ 53.) No evidence indicates that Kubacki retains access to any CFS-owned account or duplicates of those contents.

On November 10, 2021, Kubacki began working at The Bolton Group (TBG) as the "Director, Client Development & Recruitment, Finance and Accounting." (Offer Letter from TBG to Kubacki, Ex. C:6, Dkt. No. 61-3 at 22.) In an email welcoming Kubacki to TBG, TBG's Director of Talent Acquisition named Kubacki's "extensive network in Chicago [finance and accounting]" as a reason she "will be an asset to TBG and the Chicago team." ("Welcome, Isabel Kubacki" Email, Ex. C:7, Dkt. 63-1 at 25.)

Kubacki admits that since starting at TBG she has contacted at least thirteen CFS clients and is working with or has worked

with five companies with whom she had made placements while working for CFS. (Pl. Supp. Brief for Prelim. Inj., Dkt. No. 61 at 6, *citing* Pl.'s Synthesis of Kubacki Deposition, Ex D; Dkt. No. 61-4 at 4–5.) Kubacki sent emails to several people with whom she had worked at CFS in which she stated that she started new employment with TBG and provided her updated contact information associated with this role. (Kubacki's Update Emails, Exs. C:10–C:24, Dkt. Nos. 63-1–2.) In at least one email, she mentioned TBG's one-year replacement policy, which she described as "VERY good compared to most recruiting firms out there." (Kubacki Update Email, Ex. C:15, Dkt. No. 61-3 at 49 (emphasis in original).)

### C. Confidential Information and Trade Secrets

CFS considers confidential or trade secrets "detailed [] information about CFS' services, business strategies, pricing and customers" (Compl. ¶ 16), namely price points, history, possible future needs (Compl. ¶ 20). CFS terms "'Confidential Information' or 'PCR information'" clients' and candidates' "addresses, key contacts, communication logs, and transaction fees and history, among other things." (Compl. ¶ 22; *see e.g.,* Kubacki Marketing Report, ex. A:8; Dkt. No. 61-1 at 167–222.) CFS states that all CFS' confidential client and pricing information is contained in PCR. (Compl. ¶ 58.)

CFS requires its employees to sign restrictive covenants and in its training stresses the importance of restricting the information from unauthorized disclosure. (Compl. ¶¶ 25–29; *See* Ex. A, Dkt. No. 18-1.) Passwords and dual authentication restrain PCR access. (Compl. ¶¶ 22–25.) CFS generally allows its employees to access the company and candidate information associated with the employee's geographic region of responsibility. (Compl. ¶ 26.)

CFS claims to have spent millions of dollars to accumulate and develop PCR information over twenty years. (McCarthy Second Decl. ¶¶ 3, 36, Dkt. No. 61-1 (citing McCarthy First Decl. ¶¶ 14, 27–28).) These resources include:

- $2,500 for each new employee's onboarding all-expense-paid five-day trip to Boston, where new employees are provided with "detailed [] information about CFS' services, business strategies, pricing and customers" (Compl. ¶¶ 15–16);

- $150,000–$175,000 per year on "an annual conference where almost all CFS employees fly out for three days of training" (Compl. ¶ 16) and hear from external speakers that CFS hires (McCarthy First Decl. ¶ 28);

- Exposure to "[n]ational and regional training calls" (Compl. ¶ 17) and training manuals developed by CFS (*see* CFS Job Order Questionnaire, Ex. A:1, Dkt. No. 61-1);

- Advertising, which averaged $1,074,505 annually over the last three years (McCarthy First Decl. ¶ 14, Ex. 1, Dkt. No. 10-1);

- Annual licensing costs for the PCR platform (McCarthy Second Decl. ¶¶ 3, 36, Dkt. No. 61-1); and

- A subscription with LinkedIn Recruiter. (McCarthy Second Decl. ¶ 18, Dkt. No. 61-1 at 4.)

CFS alleges two counts: Breach of Contract and violations of the Illinois Trade Secrets Act. CFS requests injunctive relief under both counts.

## II. LEGAL STANDARD

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong,* 520 U.S. 968, 972, (1997) (emphasis in original).

To obtain a preliminary injunction, a party must show that it has no adequate remedy at law, that it will suffer irreparable harm in the absence of an injunction, and that it is likely to succeed on the merits. *DM Trans, LLC v. Scott,* 38 F.4th 608, 617-18 (7th Cir. 2022) (citing *Life Spine, Inc. v. Aegis Spine, Inc.,* 8 F.4th 531, 539 (7th Cir. 2021)). If a party makes these showings, the Court then "assess[es] whether the balance of harms favors them or whether the harm to other parties or the public is sufficiently weighty that the injunction should be denied." *Id.* Thus, a finding of irreparable harm to the moving party remains "a threshold requirement for granting a preliminary injunction." *DM Trans, LLC v. Scott,* 38 F.4th 608, 617 (7th Cir. 2022).

## III. <u>DISCUSSION</u>

The analyses of inadequate legal remedies and irreparable harm often merge. *See Roland Mach. Co. v. Dresser Indus.*, Inc., 749 F.2d 380*,* 386 (7th Cir. 1984).

### A. Inadequate Remedy at Law

The Seventh Circuit has enumerated four general circumstances that could result in an inadequate legal remedy: when a damages award may come too late to save the plaintiff's business; where the lost revenues would make it impossible to finance the lawsuit; where defendant's subsequent insolvency would foreclose the collection of damages; and where the nature of the loss incurred by the plaintiff would make it difficult to calculate damages. *See Girl Scouts of Manitou Council Inc. v. Girl Scouts of U.S. of Am.*, 549 F.3d 1079, 1095, n. 8.

CFS has not tendered dangers of being put out of business or declining revenue that would render it unable to afford this litigation. Instead of arguing that Kubacki would be unable to pay for harms she might cause during the pendency of litigation, CFS stipulates that Kubacki enjoys affluence. CFS has failed to show that its losses are incalculable, discussed *infra*. For these reasons, the Court finds that harms are compensable upon final judgment.

### B. Irreparable Harm

CFS offers three reasons why it faces irreparable harm in the absence of an injunction. First, it contends that lost sales and business opportunities arising from Kubacki's alleged breaches of contract and alleged misappropriation of trade secrets are incalculable. Second, CFS contends that it will lose "customer relationships, goodwill, and reputation," which it presumes to be irreparable harm. Third, CFS submits that its showing of Kubacki's use of its confidential information and trade secrets also garners a presumption of irreparable harm.

#### *1. Lost Sales and Business Opportunities*

"Lost profits generally do not constitute irreparable injury, barring exceptional circumstances." *Bidi Vapor, LLC v. Vaperz LLC,* 543 F.Supp.3d 619, 632 (N.D. Ill. 2021) (Kocoras, J.) (*citing, inter alia, Downstate Stone Co. v. United States,* 651 F.2d 1234, 1241 (7th Cir. 1981)). "[H]arm stemming from lost customers or contracts may be quantifiable if the lost customers or contracts are identifiable." *Life Spine,* 8 F.4th at 546. Even with imperfect data, harm can be quantifiable if the parties "can reasonably estimate the value of lost profits." *DM Trans,* 38 F.4th 620.

CFS describes its fear of CFS losing business directly to Kubacki's current employer. The Court interprets CFS' more abstract language to ultimately describe the same fear. (*E.g.,*

Compl. ¶¶ 64–66 ("Misappropriating clients or candidates from CFS directly impacts company revenue because the entirety of CFS' revenue is based on successfully placing candidates with its clients.").) That tradeoff is not some amorphous harm. The customers are identifiable: CFS records the sales it makes, which employee made the sale, and its PCR records contain details on all customers and prospects. Furthermore, CFS knows the dates on which Kubacki left CFS and began with TBG. It is feasible to compare the sales records before Ms. Kubacki's departure and afterwards.

CFS cites *Hess Newmark Owens Wolf, Inc. v. Owens,* 415 F.3d 630, 632 (7th Cir. 2005), to assert that its lost opportunities are unascertainable. The court in *Hess Newmark* explained that when the competitive landscape shifted such that the plaintiff would "not be able to identify which contracts slipped from its grasp," the harm could prove incalculable. *Id.* at 632–33. Here, CFS does not provide sufficient information about the Chicagoland staffing market. Without that information the Court cannot conclude that Kubacki's change of employment will turn the tides to the sort of unfair competition that rendered losses incalculable in *Hess Newmark*.

The Court finds *DM Trans* more instructive because CFS has identified discrete clients. 38 F.4th 618–622. Even when customers work with competitors simultaneously, metrics for measuring lost

sales are available. *Cf. Instant Tech., LLC v. DeFazio,* 40 F.Supp.3d 989, 1020 (N.D. Ill. 2014), *aff'd,* 793 F.3d 748 (7th Cir. 2015) (the district court found that a technology staffing firm won business ten percent of the time once a client included the firm in its network, yet past relationships with clients were not a "reasonable expectation" of future business under Illinois law). A formula could be tailored for each company by the very metrics recorded in PCR that CFS insists are so insightful — for example, the dates of contact, candidate credentials, and the company's channels used for recruiting. Thus, the Court finds that CFS can reasonably estimate the value of lost profits due to foregone sales and opportunities.

### 2. *Customer Relationships, Goodwill, and Reputation*

For "customer relationships, goodwill, and reputation," injury to which may constitute irreparable harm, CFS tenders that it "will have suffered injury to relationships being inhibited from growing upward and onward." (Pl. Supp. Brief for Prelim. Inj., Dkt. No. 61 at 13.) CFS contends, "given the nature of CFS' protectable business interest, if no restraint were imposed, CFS would likely lose valuable business relationships in the Chicagoland region, where Ms. Kubacki once worked for CFS. The harm is irreparable because no legal remedy can mend damaged or destroyed business relationships." (Dkt. No. 9-1, at 6.)

Relying on assertions, CFS fails to explain how its goodwill or reputation will falter or how its business relationships will be "damaged or destroyed." The evidence presented does not make this clear. Kubacki's emails let contacts know she has taken a new opportunity. Even if successfully soliciting staffing and recruitment services, Kubacki is not disparaging her former employer. CFS has not shown likely customer confusion (*see e.g., Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 902 (7th Cir. 2001)), reputation damage (*see e.g., Apple Inc. v. Psystar Corp.*, 673 F.Supp.2d 943, 948-49 (N.D.Cal.2009)), impairment in ability to provide services (*see e.g., Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1088 (7th Cir. 2008)), interference with niche contracts (*see e.g., Life Spine*, 8 F.4th 546), change to its business model (*see e.g., Stuller, Inc. v. Steak N Shake Enterprises, Inc.*, 695 F.3d 676, 680 (7th Cir. 2012)), or other harms courts have found to be irreparable.

Even if CFS had shown such harms, it failed to show incalculability. *See Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1441 (7th Cir. 1986) (loss of goodwill could be "adequately compensated in lost profit damages").

### 3. *Trade Secrets and Confidential Information*

CFS declares, "[i]rreparable harm may be presumed where trade secrets . . . are involved," citing *IDS Fin. Servs, Inc. v.*

*Smithson,* 843 F.Supp. 415, 418—19 (N.D. Ill. 1994). (Dkt. No. 9 at 6.) The Seventh Circuit has since clarified that a former employee's use of confidential information or trade secrets is not independently sufficient to establish irreparable harm. *DM Trans,* 38 F.4th 621 (confidential information); *Life Spine,* 8 F.4th 545 (trade secrets). Even if CFS established that Kubacki unlawfully misappropriated trade secrets or confidential information, CFS must show a threat of future irreparable harm, *i.e.,* not merely lost profits relating to identifiable clients. *See DM Trans,* 38 F.4th 621. It has not done so.

CFS also argued that injunctive relief was necessary to prevent dilution of its hefty investment in confidential information and trade secrets. The record lacks sufficient detail for the Court to conclude that any dilution would be irreparable. While the record does contain monetary figures for spending on employee conferences and advertising, CFS cites no authority that leads this Court to view these investments as grounds for injunctive relief. Kubacki makes a compelling argument that active hiring needs and candidate availability carry short shelf lives. Such information that Kubacki could have obtained from CFS' database around the time of her departure in October 2021 is likely too stale to inflict irreparable harm in February 2023.

For these reasons, CFS fails to make a persuasive showing of irreparable harm that would justify a preliminary injunction. Because CFS has not shown an irreparable harm or that legal remedies available would be inadequate, the Court need not evaluate the likelihood of success on the merits nor balance harms. *See Halczenko v. Ascension Health, Inc.,* 37 F.4th 1321, 1326 (7th Cir. 2022) (*citing Winter v. Natural Resources Defense Council,* 555 U.S. 7, 31–33 (2008)).

## IV. CONCLUSION

For the reasons stated herein Plaintiff's Motion for a Preliminary Injunction [Dkt. No. 9] is denied.

**IT IS SO ORDERED.**

 Harry D. Leinenweber, Judge
 United States District Court

Dated: 2/8/2023