**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

CREATIVE FINANCIAL STAFFING LLC,    )
   )
      Plaintiff,    )
   )    No. 22-cv-00488
     v.    )
   )    Judge April M. Perry
ISABEL LOPERA KUBACKI,    )
   )
      Defendant.    )
   )

## OPINION AND ORDER

This case arises from events surrounding the termination of Defendant Isabel Lopera Kubacki ("Defendant") from her former employer, Plaintiff Creative Financial Staffing, LLC ("CFS"). CFS is an executive search firm that helps businesses find and hire employees. For years, Defendant worked at CFS as a recruiter, earning commissions for successfully placing candidates at CFS clients. While employed at CFS, Defendant executed agreements with CFS that contained non-solicitation and non-disclosure clauses. Following her termination from CFS in October 2021, Defendant took on a similar recruiting role at The Bolton Group ("TBG"), a competing search firm. CFS soon learned that after her move to TBG, Defendant reached out to CFS clients and placed jobseekers she had come into contact with while at CFS. CFS believed Defendant's actions violated the terms of her employment agreements and sued her for breach of contract and misappropriation of trade secrets. Defendant countersued for wage theft based on commissions she asserts she earned for her work on three candidate placements that successfully closed after her departure.

Pending before the Court is Defendant's motion for summary judgment. For the reasons set forth below, her motion is denied.

## LEGAL STANDARD

A party is entitled to summary judgment when there is no genuine dispute of material fact such that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The party opposing summary judgment must then come forward with specific facts showing there is a genuine issue for trial. *LaRiviere v. Bd. of Trs.*, 926 F.3d 356, 359 (7th Cir. 2019). To avoid summary judgment, the nonmovant must show more than metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The court must construe the facts in the light most favorable to the nonmovant and draw all reasonable inferences in his favor but need not draw inferences supported by only speculation or conjecture. *Swetlik v. Crawford*, 738 F.3d 818, 829 (7th Cir. 2013).

## FACTS AT SUMMARY JUDGMENT

The Court draws the following facts from the parties' Rule 56.1 statements and responses, the materials cited therein, and other aspects of the record.

### I.    CFS

CFS is an executive search firm that works on a contingency-fee basis to help businesses find and hire new employees. Doc. 170 ¶ 1. Each CFS placement begins with a job order, which is a request by a CFS client to find a candidate for an open position. *Id*. ¶ 4. CFS's work for a client is governed by a fee agreement, under which CFS earns a fee payment from the client if a candidate sourced by CFS is hired by the client within a certain time period. *Id*. ¶ 8. The CFS employees responsible for fulfilling job orders are called recruiters. *See id*. ¶¶ 5-6. These recruiters do more than put candidates and hiring personnel in touch. They also participate

2

throughout the hiring process, taking on such tasks as interview scheduling, shepherding candidates through the interview process (by conducting preparatory sessions, answering candidate questions, and debriefing post-interviews), discussing salary expectations, and coordinating background and drug testing, among other tasks. See Doc. 176 ¶ 8.

Sometimes multiple CFS recruiters work on the same job order, or one recruiter finds the candidate but another works with the client during the hiring process. When this occurs, both recruiters involved in fulfilling the order receive a portion of the commission. Doc. 170 ¶¶ 19-20. However, the parties disagree on what must occur for a recruiter to be entitled to their commission, the primary dispute being whether recruiters are eligible to receive a commission if they are no longer employed with CFS at the time the placement is complete. *See* Doc. 170 ¶ 19; Doc. 170-1 ¶ 22.

CFS avers that it strives to cultivate long-term relationships with its clients, some of which have been maintained for fifteen years. Doc. 176 ¶ 4, citing Doc. 10-1 ¶ 18. To aid its long-term efforts, CFS uses a software system called PCR for tracking client and candidate information. Doc. 176 ¶ 4. This password-protected system requires dual authentication to access and houses information including client and customer contact information, client job listings (including historic listings) and specifications, characteristics and requirements sought by CFS clients, and client preference information, including skillsets and personality styles especially valued by a client. Doc. 176 ¶¶ 6-7. CFS's witness has testified that this database "cannot be easily replicated, as it took years to create and compile" and that access to PCR information for a given client is limited even within CFS to only employees operating in the geographic region of that client. Doc. 10-1 ¶¶ 19-20.

CFS deploys a number of measures to protect what it considers to be competitively valuable information about the clients and candidates with whom it works. These measures include, but are not limited to, having its employees execute confidentiality agreements and trade secret acknowledgements that bar them from using or disclosing CFS materials, asking its clients not to share resumes of CFS-sourced candidates, and reminding employees in its Employee Handbook that all company records are company property and that emails should not be sent except on a need-to-know basis. *See* Doc. 176 ¶ 11.

**II.    Defendant's Employment at CFS**

Defendant worked at CFS as a recruiter for many years before her termination. While employed at CFS, Defendant executed two agreements at issue in this summary judgment motion. These are a Non-Compete/Non Disclosure Agreement ("Noncompete Agreement") and an Acknowledgement of Employee Regarding Confidential Information and Trade Secrets ("Acknowledgement"). The Noncompete Agreement contains the following provisions:

> 6. <u>Nondisclosure of Information</u>: Employee shall not … disclose to any person, firm, corporation, or other business entity, the name, address, contact persons, or requirements of any customer, client or applicant of the Employer … or disclose any information … of any kind acquired during the course of employment belonging to or related to the affairs of the Employer provided that one (1) year after termination of employment Employee may solicit customers of Employer…

> 7. <u>Restrictive Covenants</u>: For a period of twelve (12) months after termination of the Employee's employment with the Employer for whatever cause, the Employee shall not within a radius of fifty (50) miles from the Employer's office in Riverwoods, IL, directly or indirectly, own, manage, operate, control, or be employed by, participate in, or be connected in any manner with the ownership, management, operation, or control of any temporary employment service or employment agency or nay [sic] business competitive with the business carried on by the Employer, now or at any time during his or her employment and among other things shall not during this period

>> a. Solicit the trade or patronage of any of Employers' customers or applicants for himself or herself or for any other person or organization engaging in the business of temporary or full-time employment; the Employer's customers shall include all persons and organizations for whom the Employer performs or has performed services in the course of its business within three (3) years pervious [sic] to

4

> Employee's termination of employment, regardless of whether or not such customers were previously customers of the Employee or of others …

Doc. 18-1 at 3.

The Acknowledgment states that CFS's trade secrets include "the names, addresses, telephone numbers, qualifications, education, accomplishments, experience and resumes of all persons who have applied or been recruited for employment" as well as various categories of information related to CFS clients. *Id*. at 5. It also requires that employees "agree not to disclose such information to any party, nor to use such information on my own behalf" in the event of a "termination, or during the course of any future employment." *Id*.

In 2020, Defendant spoke with an employee at TBG, another recruiting firm that sometimes competes with CFS for business, and sent TBG copies of her CFS employment agreements. Doc. 176 ¶ 14. It seems at least one purpose of this exchange was to have TBG evaluate whether Defendant could work for TBG without violating the terms of her employment agreement with CFS. *See* Doc. 63-1 at 19.

Defendant was terminated on October 28, 2021. Doc. 170 ¶ 3. In November 2021, she began working at TBG. *See* Doc. 63-1 at 22-25. In the months leading up to her departure from CFS, Defendant sent 1,419 emails from her CFS email address to non-work email addresses, including her personal Gmail account. Doc. 176 ¶ 17. Some of these emails included the contact information and names of hiring personnel at CFS clients with whom Defendant worked. *Id*. Others contained resumes and other information submitted by candidates to CFS, three of which Defendant later forwarded from her personal email to her TBG email. *Id*. ¶ 21. From her new post at TBG, Defendant sent emails to various clients she had worked with at CFS to inform them of her new contact details and employment at TBG. *Id*. ¶ 22. She also earned commissions

for successfully placing with TBG clients a number of candidates that Defendant had either contacted or first become aware of while still employed at CFS. *Id.* ¶ 20.

### III. Defendant's Work on Three Job Placements

In her final weeks at CFS, Defendant worked on job orders for three CFS clients (hereinafter: Client 1, Client 2, Client 3).

On September 14, 2021, Defendant submitted "DR" as a candidate for an open position with Client 1. Doc. 170 ¶ 23. Defendant found DR through LinkedIn. Doc. 158-3 ¶ 25. Client 1 made an offer to a different candidate that initially accepted but then changed his mind. *Id.* ¶ 27. On October 15, Defendant reached out to her contact at Client 1 to ask if they would reconsider DR and subsequently exchanged emails with the contact arranging a virtual interview with DR. *Id.* ¶¶ 26-27. On October 29, the contact emailed Defendant's CFS email to ask her to coordinate an in-person interview for DR. *Id.* ¶ 28. Because Defendant had been terminated on October 28, this request reached Debbie Benes, another recruiter at CFS, who contacted DR and took over the steps of guiding him through Client 1's application process. Doc. 170-2 ¶¶ 10-12. After scheduling DR's interview with Client 1, Ms. Benes sent DR details of the position and prepared him for the interview and discussed his salary requirements. *Id.* ¶¶ 13-14. After the interview, Ms. Benes also assisted Client 1 by coordinating DR's drug test and background check, among other steps. *See id.* ¶¶ 15-30.

On October 12, 2021, Defendant submitted "JP" as a candidate for an open position at Client 2. Doc. 170 ¶ 37. JP was a candidate sourced by Luke Singh, another recruiter at CFS. *Id.* ¶ 36. On October 27, Defendant scheduled an in-person interview for JP. *Id.* ¶ 38. After Defendant's termination on October 28, Mr. Singh took over the task of shepherding JP through Client 2's hiring process. Steps taken by Mr. Singh included preparing JP for her initial

interview, scheduling further interviews, arranging background and reference checks, and discussing a counteroffer received by JP from her former employer. Doc. 176 ¶ 31; *see also* Doc. 170-3 ¶¶ 14-30.

On October 20, 2021, Defendant submitted "DW" as a candidate for an open position at Client 3 after sourcing DW from LinkedIn. Doc. 158-3 ¶¶ 41-43. On October 28, the day of her termination, Defendant emailed her contact at Client 3 to set up an in-person interview for DW. After her termination, Dale Fredericksen took over the task of shepherding DW through Client 3's recruitment process, leading ultimately to her hiring. Doc. 176 ¶¶ 33-35.

## ANALYSIS

Defendant seeks summary judgment on: (1) her counterclaim against CFS brought under the Illinois Wage Payment and Collection Act ("Wage Act"), 820 ILCS § 115/2; (2) CFS's breach of contract claim, to the extent it arises from breach of the noncompete and non-solicitation provisions in her employment agreements; and (3) CFS's misappropriation claim brought under the Illinois Trade Secrets Act ("ITSA").[1]

### I. Defendant's Wage Theft Counterclaim

Defendant contends she is entitled to summary judgment on her counterclaim brought under the Wage Act. Specifically, she asserts there is no dispute that she was entitled to commission payments for her pre-termination work placing candidates at Client 1, Client 2, and Client 3.

Defendant argues that her entitlement to commissions is governed by the common law doctrine of procuring cause, which provides that an employee "discharged prior to the

---

[1] CFS asserts that Defendant's motion is premature due to the fact that discovery in this case remains open. The Court will address this argument to the extent it bears on the Court's summary judgment analysis.

culmination of a sale, but after … she has done everything that is necessary to effect the sale" is entitled to commission on sales made, even after termination. *Houben v. Telular Corp.*, 231 F.3d 1066, 1073 (7th Cir. 2000). The doctrine supplies "a default rule [that] applies only if the contract does not expressly provide when commissions will be paid." *Rico Indus., Inc. v. TLC Group, Inc.*, 123 N.E.3d 567, 587 (Ill. App. Ct. 2018); *Solo Sales, Inc. v. North America OMCG, Inc.*, 702 N.E.2d 652, 654 (Ill. App. Ct. 1998) (rule does not apply where "the contract between the parties specifies when commissions are earned"). Whether a salesperson is actually the procuring cause of a sale is a question of fact, typically to be decided by the jury. *Houben*, 231 F.3d at 1073.

Defendant has put forth undisputed evidence that she was the source of the candidates for two of the three job orders.[2] CFS has put forth undisputed evidence that after Defendant was gone, other recruiters took over and helped to schedule and prepare the candidates for interviews, conducted background and reference checks, and engaged in negotiations with the candidates. Although both parties agree that the clients were obligated to pay a commission if the clients hired the candidates who Defendant had introduced to them, the Court considers this to be a distinct issue from whether Defendant had done "everything that is necessary to effect the sale." After all, the clients had the right not to hire the candidates at all, and presumably would not have done so if the interviews, negotiations, or background checks went badly. Based upon these facts, a reasonable jury could easily conclude that Defendant's introduction of candidate to client was not all that was necessary to effectuate the hirings. *Cf., Furth v. Inc. Pub. Corp.*, 823 F.2d 1178, 1180 (7th Cir. 1987) (upholding factual finding that advertising salesman was not entitled

---

[2] CFS does not meaningfully challenge Defendant's assertion that she was the source of the candidates, though on this point, the Court is mindful that discovery remains open.

to rely on procuring cause doctrine where the advertisements arranged with his clients could have been withdrawn after his departure).

Both parties have submitted evidence about CFS's standard practices for paying commissions. Defendant points out that she earned commissions during maternity leave where she did little work beyond initial presentment of the candidate. *See* Doc. 157 at 11. CFS argues that its policy is to not pay commissions on job orders where the employee leaves before the candidate has accepted an offer. *See* Doc. 170-1 ¶ 22 (asserting "there is no entitlement to a commission for a recruiter unless they are employed with CFS when the placement is closed [meaning] a job offer has been accepted by both client and candidate"). Neither party has argued that these policies created the equivalent of a contractual right to commission payment (or not), and this is significant: if a contract exists governing commission, the procuring cause rule does not apply at all. *AA Sales & Assoc., Inc. v. Coni-Seal, Inc*., 550 F.3d 605, 610 (7th Cir. 2008) ("the procuring cause rule is merely a default rule and is inapplicable when a contract specifies other bases of fee recovery"). In any event, whether these policies create a binding contract, or something less than a legally enforceable contract which still may serve as the basis for a Wage Act claim, *see Catania v. Local 4250/5050*, 834 N.E.2d 966, 971-72 (Ill. App. Ct. 2005), they do not support a common law basis for relief for Defendant in this case because they do not speak to what is required of the recruiter in order to effect the sale within the meaning of the procuring cause doctrine.[3] That remains a disputed issue between the parties. Accordingly, the Court denies Defendant's motion for summary judgment on her Wage Act counterclaim.

---

[3] The Court notes that employee recruiting is significantly more complex than most cases applying the procuring cause doctrine, which tend to involve a sale of a product at a set price. *See, e.g., Lord v. Melton*, 400 N.E.2d 547 (Ill. App. Ct. 1980) (finding a real estate broker is entitled to the commission when "he has either sold the property in question, been instrumental in bringing about the sale, or … he procured a purchaser who was ready, willing and able to purchase at the stipulated terms"). Given the human

Defendant also argues that if she prevails on her Wage Act claim, the Court should award her attorneys' fees and bar CFS from asserting contract claims against her under a theory that CFS's failure to pay her wages constitutes a material breach. Since she has not so prevailed, the Court declines to award attorneys' fees and need not at this time consider the merits of her argument regarding whether CFS' supposed wage theft would prevent it from asserting restrictive covenants in her employment agreements against Defendant.

## II.    Breach of Contract Claim

Count One of CFS's complaint is a breach of contract claim premised on the nondisclosure and non-solicitation provisions of agreements Defendant executed while at CFS. Defendant seeks summary judgment as to the non-solicitation provision of the Noncompete Agreement, which she asserts is overly broad and thus facially unenforceable. In relevant part, the non-solicitation language in the Noncompete Agreement provides that Defendant shall not

> [s]olicit the trade or patronage of any of Employers' customers or applicants for himself or herself or for any other person or organization engaging in the business of temporary or full-time employment; the Employer's customers shall include all persons and organizations for whom the Employer performs or has performed services in the course of its business within three (3) years pervious [sic] to Employee's termination of employment, regardless of whether or not such customers were previously customers of the Employee or of others …

Doc. 18-1 at 3.

The Court analyzes Defendant's enforceability challenge under Illinois law.[4] Restrictive covenants, which include non-solicitation covenants, are reviewed for reasonableness and upheld

---

dynamics at play when placing a jobseeker with an employer, the Court finds it even more important that a factfinder decide the question of what was necessary to effect the placement.

[4] The Noncompete Agreement contains a provision that selects Michigan law as the governing body of law, *see* Doc. 18-1 ¶ 12, but since neither party invoked the agreement's choice-of-law provision in their briefing, the Court finds the parties have acquiesced to the application of Illinois law. *See*, *e.g.*, *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014) (choice of law arguments waived when not asserted).

only if the covenant "(1) is no greater than is required for the protection of a legitimate business interest of the employer-promisee … (2) does not impose undue hardship on the employee-promisor, and (3) is not injurious to the public." *LKQ Corp. v. Rutledge*, 96 F.4th 977, 981-82 (7th Cir. 2024), citing *Reliable Fire Equip. Co. v. Arredondo*, 965 N.E.2d 393, 396 (Ill. 2011). Illinois courts recognize that a business typically has "no proprietary interest in its clients," except in situations

> where, by the nature of the business, an employer has a near-permanent relationship with its customers and, but for his association with his employer, an employee would have had no contact with them; or where the former employee learns trade secrets or acquires other confidential information during his employment and subsequently attempts to use it for his own benefit.

*Arpac Corp. v. Murray*, 589 N.E.2d 640, 647 (Ill. App. Ct. 1992).

Making this determination "necessarily turns on the facts and circumstances of each case." *Lawrence & Allen, Inc. v. Cambridge Hum. Res. Grp., Inc.*, 685 N.E.2d 434, 441 (Ill. App. Ct. 1997). For instance, whether near-permanent relationships are a hallmark of an industry "turns in large degree on the nature of the business involved." *Office Mates 5, North Shore, Inc. v. Hazen*, 599 N.E.2d 1072, 1081-82 (Ill. App. Ct. 1992) (collecting cases). Similarly, whether a non-solicitation covenant is necessary to protect an employer's customer lists depends in part on whether that list was developed "over a number of years at great expense and kept under tight security," and where it is not "available to other employees and known by those in the trade [or] easily duplicated." *Label Printers v. Pflug*, 564 N.E.2d 1382, 1389 (Ill. App. Ct. 1991).

Even when a non-solicitation covenant protects a legitimate business interest, it may still be invalid if it is not "narrowly tailored to protect only against activities that threaten [that] interest." *Lawrence & Allen*, 685 N.E.2d at 442. Following this principle, Illinois courts have declined to enforce non-solicitation covenants that prevent ex-employees from soliciting customers regardless of whether the employee had contact with them as an employee or whether

they became customers after the employee left. *Cambridge Eng'g, Inc. v. Mercury Partners 90 BI, Inc.*, 879 N.E.2d 512, 528 (Ill. App. Ct. 2007); *see also Lawrence & Allen*, 685 N.E.2d at 443 (finding unreasonably overbroad a covenant barring ex-employee from soliciting clients who he had no relationship with while with his former employer); *AssuredPartners, Inc. v. Schmitt*, 44 N.E.3d 463, 474-75 (Ill. App. Ct. 2015) (non-solicitation covenant unenforceable as a matter of law where it barred ex-employee from "working in the future with customers, suppliers, and other business entities which he never had contact with while working for" his former employer).

Defendant contends that the non-solicitation covenant in her Noncompete Agreement is unenforceable as drafted, in part because it bars her from working with CFS clients she was unaware of or never worked with while at CFS. For its part, CFS argues that "[a]though courts closely scrutinize noncompetition agreements … only in extreme cases will a court find such an agreement invalid on its face." *Abbot-Interfast Corp. v. Harkabus*, 619 N.E.2d 1337, 1343 (Ill. App. Ct. 1993) (denying a request in motion for judgment on the pleadings to invalidate restrictive covenant); *Lawrence & Allen*, 685 N.E.2d at 441 (enforceability of restrictive covenant is "a determination that necessarily turns on the facts and circumstances of each case").

The Court rejects Defendant's argument that the non-solicitation covenant is unenforceable as written. In at least some situations, Illinois courts have upheld broadly drafted non-solicitation covenants that did not limit their reach to only customers with whom the bound employee interacted. *See Arpac*, 589 N.E.2d at 649 (upholding 24-month covenant not to solicit any customers that had dealings with employer for prior five years, without further limitation); *Abbot-Interfast*, 619 N.E.2d at 1343 (declining, before any discovery was taken, to invalidate restrictive covenant barring solicitation of any of employer's customers). Given the current state

of this factual record, the Court declines at this time to find the non-solicitation clause wholly unenforceable.

The facts in this case, viewed in the light most favorable to CFS, demonstrate that CFS strives to cultivate long-term relationships with its clients, some of whom it has maintained for fifteen years. Doc. 171 ¶ 4, citing Doc. 10-1 ¶ 18. In order to maintain these relationships, CFS manages a password-secured client tracking software called PCR that houses all manner of client information, and that gives CFS an enduring, competitive advantage in the staffing industry. *See* Doc. 171 ¶¶ 5-7. CFS's witness has testified that this database "cannot be easily replicated, as it took years to create and compile" and that access to client information in PCR is limited to only CFS employees that would have reason to access it. Doc. 10-1 ¶¶ 19-20. In her response to these assertions, Defendant raises evidentiary objections but does not otherwise dispute the substance. *See* Doc. 176 ¶¶ 4-7. Accordingly, the Court concludes that CFS's evidence suffices to at least put at issue whether its customer list reflects working relationships developed "over a number of years at great expense and kept under tight security," and so Defendant is not entitled to summary judgment as to the enforceability of the non-solicitation covenant. *Label Printers*, 564 N.E.2d at 1389.

For the foregoing reasons, the Court rejects Defendant's argument that the non-solicitation covenant in her Noncompete Agreement is unenforceable as written and thus denies her motion for summary judgment as to CFS's breach of contract claim.

### III. Misappropriation of Trade Secrets Claim

Defendant also seeks summary judgment as to CFS's claim for trade secret misappropriation brought under ITSA. The elements of an ITSA violation are (1) existence of a trade secret, (2) defendant's misappropriation of that trade secret through improper acquisition,

disclosure, or use, and (3) resulting injury. *See Brian J. Wanca, J.D., P.C. v. Oppenheim*, 226 N.E.3d 732, 741 (Ill. App. Ct. 2023). Defendant's challenge focuses solely on whether CFS can prove that its materials meet the statute's definition for a trade secret, not CFS's evidence of misappropriation and injury.[5] Under ITSA, trade secrets are defined as

> … information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:
>
> (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and
>
> (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality."

765 ILCS 1065/2(d). The statute's two requirements both focus on secrecy, but "emphasize different aspects." *Learning Curve Toys, Inc. v. Playwood Toys, Inc.*, 342 F.3d 714, 722 (7th Cir. 2003). The first element emphasizes economic value and "precludes trade secret protection for information generally known or understood within an industry even if not to the public at large." *Id.*, citing *Pope v. Alberto-Culver Co.*, 694 N.E.2d 615, 617 (Ill. App. Ct. 1998). On this logic, courts are more likely to grant trade secret protection to material that takes "substantial time, money, and effort" to acquire and less likely to extend it to "information [that] can be readily duplicated" without much investment. *Oppenheim*, 226 N.E.3d at 742. The second secrecy element focuses on the ITSA plaintiff's "affirmative measures to prevent others from using its proprietary information," and denies trade secret protection to a plaintiff that declines to make reasonable efforts to preserve secrecy. *Learning Curve Toys*, 342 F.3d at 722. Reasonableness is largely a factual question, but protective measures a firm can take include having employees sign

---

[5] Defendant makes a passing reference to CFS's "misappropriation" argument in her reply. *See* Doc. 175 at 15. However, the Court understands this argument to really be about whether CFS took reasonable measure to protect its supposed trade secrets, which the Court discusses below.

confidentiality agreements, making sure employees understand the importance of confidentiality, and limiting access to secret information to a need-to-know basis. *See*, *e.g.*, *Stampede Tool Warehouse, Inc. v. May*, 651 N.E.2d 209, 216 (Ill. App. Ct. 1995) (protective measures taken were reasonable).

Overall, "[t]he existence of a trade secret is ordinarily a question of fact," and so the Court must be careful not to substitute its judgment for what merits trade secret protection for that of the jury. *Learning Curve Toys*, 342 F.3d at 723; *see also Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 925 F.2d 174, 180 (7th Cir. 1991) (allowing jury to decide reasonableness of measures taken to protect supposed trade secrets).

Before examining CFS's evidence, the Court addresses Defendant's argument that the Court should grant summary judgment in its favor due to CFS's failure to precisely identify in interrogatory responses the matter over which CFS claims trade secret protection. The Court is sympathetic that sorting through voluminous, nonspecific responses to interrogatories can be frustrating. However, it declines to grant Defendant summary judgment on this basis. CFS was required to identify specific evidentiary material showing a genuine issue for trial in response to Defendant's summary judgment motion, and to do so in compliance with Local Rule 56.1's instruction that factual arguments be supported by citation to specific pages of the record. *See LaRiviere v. Bd. Of Trs.*, 926 F.3d 356, 359 (7th Cir. 2019); L.R. 56.1(b)(3), (d)(2). CFS has submitted an additional statement of material facts directing the court, with citations, to the material that forms the basis of its ITSA claim, to which Defendant has responded. Doc. 171, 176. That is, at the "put up or shut up" phase of litigation, CFS put up its evidence. *Brown v. CACH, LLC*, 94 F.4th 665, 667 (7th Cir. 2024). These citations make it possible for the Court to make a merits determination as to whether a genuine dispute exists regarding the trade secret

status of CFS's cited material, without requiring the Court to "hunt through the details in search of items meeting the statutory definition." *IDX Sys. Corp v. Epic Sys. Corp*, 285 F.3d 581, 584 (7th Cir. 2002).

With that, the Court turns to the categories of material over which CFS claims trade secret protection.

### a. Client information

CFS asserts that certain information about its existing clients merits trade secret status. This includes client names as well as the names of contacts with hiring authority. Doc. 176 ¶ 16. CFS also claims trade secret status over job order specifications and "particular characteristics and requirements of persons generally hired by a company," though Defendant's arguments are mostly targeted at the former category of client names and contacts.

Boiled down, CFS seeks trade secret protection over its customer list. *See*, *e.g.*, *Liebert Corp. v. Mazur*, 827 N.E.2d 909, 923 (Ill. App. Ct. 2005) (analyzing employer's customer database, which included "appropriate contacts or authorized buyers within each [client]" as a customer list). Under ITSA, a customer list may be entitled to trade secret protection if it was "developed through the laborious method of prospecting, which requires a substantial amount of time, effort and expense." *Stampede Tool Warehouse, Inc. v. May*, 651 N.E.2d 209, 216 (Ill. App. Ct. 1995); *see also American Family Mut. Ins. Co. v. Roth*, 485 F.3d 930, 933 (7th Cir. 2007) (customer list might be trade secret if "it represents an investment on the part of the firm seeking to protect it"). To aid their analysis, courts often look to whether the information in a customer list is "readily available from any one source," which militates against finding that the list warrants trade secret protection. *Stampede Tool*, 651 N.E.2d at 216.

16

Defendant argues that in the recruiting industry, client names and points of contact are ineligible for trade secret protection. She testifies that she is often invited to conference calls to discuss placements where representatives of competitors are present, and that the employers that use recruitment firms almost always post their job openings publicly. *See* Doc. 170 ¶¶ 68-69. While Defendant's testimony helps to illuminate industry dynamics, it does not go so far as establishing the absence of any genuine dispute as to whether CFS's customer lists merit trade secret protection. She has not, for instance, introduced evidence that CFS's customer lists are public knowledge and easily replicated, even if competitors are aware of some of CFS's clients because they attend some of the same conference calls.

Defendant also relies on *Instant Tech., LLC v. DeFazio* to argue that client lists can never be trade secrets in the recruiting industry. 40 F.Supp.3d 989, 1012 (N.D. Ill. 2014). This decision is not binding, and not even especially persuasive because what Defendant asks the Court to rely on are conclusions drawn from *DeFazio*'s case-specific factual findings. *DeFazio* also was decided following a full trial on the merits and weighing of evidence, which the Court may not engage in when deciding a motion for summary judgment. *Reinebold v. Bruce*, 18 F.4th 922, 927 (7th Cir. 2021).

For its part, CFS has introduced evidence that it strives to cultivate long-term relationships with repeat clients and that as a starting point for these relationships, CFS will sometimes cold-call companies to see if it can provide staffing assistance. *See* Doc. 61-1 ¶¶ 2-5. A reasonable inference could be drawn from these assertions that CFS's customer list "represents an investment on the part of the firm seeking to protect it." *Roth*, 485 F.3d at 933. Though more specifics might be necessary for CFS to prevail at trial, given that the existence of a trade secret is "ordinarily a question of fact," the Court declines to substitute its judgment for that of the jury

17

and concludes CFS has introduced enough evidence to put the secret quality of its customer lists in genuine dispute. *Learning Curve Toys*, 342 F.3d at 723.

To survive summary judgment, CFS must also show there is a genuine dispute as to whether it undertakes reasonable measures to keep its customer list secret. CFS executes nondisclosure agreements with employees that bar them from disclosing client information, Doc. 18-1 at 5, and has its employees log client details in a password-protected database requiring dual authentication. Doc. 176 ¶¶ 6-7. CFS's Employee Handbook asserts that all electronic documents are company records and admonishes employees to "disclose information or documents from an E-mail system only to authorized persons with a need to know." Doc. 158-30 at 19. And even among its own employees, CFS limits access to information about CFS clients to only those employees within that client's geographic region. Doc. 10-1 ¶¶ 19-20.

Defendant contends that CFS did not prohibit her from using her personal email for work, instruct her to keep client and candidate names confidential, or require her to delete personal emails or texts that might contain CFS secret information on the day of her termination. Doc. 170 ¶¶ 63-67. CFS disputes some of these points and admits other, but the Court need not wrestle with the evidentiary basis of these assertions to conclude that summary judgment in Defendant's favor is not appropriate. Suffice to say, the Court recognizes that some of Defendant's assertions could sway a jury to conclude that CFS's measures to keep its information secret were not reasonable. But as Defendant cites no legal precedent holding that any of these supposed security missteps is decisive, as a matter of law, on the trade secret question, the Court understands that what Defendant is really asking is for the Court to is weigh her evidence against CFS's. The Court will not do so. *Reinebold*, 18 F.4th at 927 (at summary judgment stage, courts may not "make credibility determinations, weigh the evidence, or decide which inferences to draw from

the facts"). Rather, on the current record, the Court concludes that a jury could find that CFS took reasonable measures to protect information it received from candidates. *Learning Curve Toys*, 342 F.3d at 725. That is enough for CFS to survive summary judgment as to whether its customer lists are trade secrets under ITSA.

### b. Candidate information

CFS also seeks trade secret protection over resumes and other information relating to the candidates with whom it works. CFS has presented undisputed evidence that while she still worked at CFS, Defendant received resumes and candidate information, at least some of which she later transmitted to her personal Gmail account and her TBG email. *See* Doc. 171-11; 171-12; 171-13.

Defendant argues that CFS cannot have a protectable interest in its candidate information, including resumes, because candidates are free to work with other recruiters and most of the relevant candidate details are frequently publicly available on websites like LinkedIn. This is not quite right. The Court agrees that certain candidate details are often available publicly. But the fact that a person is open to a job change, either at that moment or in predictable cycles, is not typically public information. The Court infers that this information is valuable to recruiting firms like CFS and TBG because it distinguishes dead ends from real commission prospects, insofar as recruiting firms strive not to waste their time working with individuals that lack desire to switch employers. Nor does the Court have trouble imagining that once CFS identifies a jobseeker through cold-calling or other prospecting, it has strong incentive to not let competitors know, lest one swoop in and place the candidate before CFS can do so. That is, there is value to being the first or only recruiter to know a highly qualified candidate is looking for a job, even if CFS does not have an exclusive right to place them.

19

Under ITSA, information is not eligible for trade secret status unless it is economically valuable for being secret and not "generally known or understood within the industry." *Learning Curve Toys*, 342 F.3d at 722; *see also Liebert Corp*, 827 N.E.2d at 923 (fact that customer contact information was listed in telephone directories did not vitiate trade secret status of employer's customer list, where task of compiling list required additional research through phone calls and prospecting); *Stampede Tool*, 651 N.E.2d at 216 (extending trade secret status to economically valuable list of customers "not readily available from any one public source"). Defendant neither argues nor establishes with undisputed facts that the status of candidates as jobseekers is publicly available or otherwise "readily duplicated." *Oppenheim*, 226 N.E.3d at 742. Thus, for the aforementioned reasons, the Court draws all reasonable inferences in CFS's favor and concludes there is at least a genuine dispute as to whether CFS's candidate list merits trade secret protection.

Again, CFS only survives summary judgment if there is enough evidence in the record for a jury to conclude that CFS takes reasonable measures to keep candidate information secret. Some of the steps CFS takes to protect candidate information are the same as those it takes to protect client details, such as having its employees execute nondisclosure agreements, *see* Doc. 18-1 at 5, requiring that its employees log candidate details in its password-protected PCR database, *see* Doc. 176 ¶¶ 6-7, and prohibiting unauthorized emailing and instructing employees that electronic documents are company records. Doc. 158-30 at 19. CFS also takes the further step of asking its clients not to disclose the candidate resumes received without CFS's consent. *See* Doc. 158-13 at 4 ("Resumes of CFS-recommended candidates are the property of CFS … and may not be referred to or shared with other business or organizations without the expressed written consent of CFS"). On this evidence, the Court concludes that a jury could find CFS took

reasonable measures to protect information it received from candidates. *Learning Curve Toys*, 342 F.3d at 725.

The Court concludes that genuine factual issues remain as to whether CFS's client lists and candidate information constitute trade secrets. As this is the only challenge raised by Defendant as to CFS's misappropriation claim under ITSA, the Court denies Defendant's motion seeking summary judgment on this claim.

## CONCLUSION

For the foregoing reasons, the Court denies Defendant's motion for summary judgment in its entirety.

Dated: March 24, 2025

_____
APRIL M. PERRY
United States District Judge